**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ULTIMATE COLLISION REPAIR, INC., | Civ. A. No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| STATE FARM INDEMNITY COMPANY, STATE FARM GUARANTY INSURANCE COMPANY, PROGRESSIVE FREEDOM INSURANCE COMPANY, PROGRESSIVE GARDEN STATE INSURANCE COMPANY, ALLSTATE NEW JERSEY INSURANCE COMPANY, ALLSTATE NEW JERSEY PROPERTY AND CASUALTY INSURANCE COMPANY, NATIONWIDE MUTUAL INSURANCE COMPANY, GOVERNMENT EMPLOYEES INSURANCE, COMPANY, GEICO CASUALTY COMPANY, GEICO INDEMNITY COMPANY, USAA CASUALTY INSURANCE COMPANY, UNITED SERVICES AUTO ASSOCIATION, USAA GENERAL INDEMNITY COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY, LIBERTY INSURANCE CORPORATION, LM INSURANCE CORPORATION, 21ST CENTURY CENTENNIAL INSURANCE COMPANY, 21ST CENTURY ASSURANCE COMPANY, 21ST CENTURY PINNACLE INSURANCE COMPANY, HANOVER INSURANCE COMPANY, AMERICAN FAMILY HOME INSURANCE COMPANY, HARTFORD INSURANCE COMPANY OF THE MIDWEST HARTFORD UNDERWRITERS INSURANCE COMPANY, HARTFORD FIRE INSURANCE COMPANY, | (Jury Trial Demanded) |
| Defendants. | |

Plaintiff, ULTIMATE COLLISION REPAIR, INC, by and through its undersigned attorneys, for its Complaint against the above-named Defendants states as follows:[1]

## PARTIES

1.      Plaintiff Ultimate Collision Repair, Inc., is a New Jersey corporation authorized to do business and is doing business at 1115 US Highway 1, Edison, New Jersey 08837.

2.      Defendant State Farm Indemnity Company is a New Jersey company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 300 Kimball Drive, Parsippany, NJ 07054.  This Defendant may be served with process upon any officer or director, 300 Kimball Drive, Parsippany, NJ 07054.

3.      Defendant State Farm Guaranty Insurance Company is an Illinois company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is One State Farm Plaza,  Bloomington, IL 61710.  This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

4.      Defendant Progressive Freedom Insurance Company is, upon information and belief, a New Jersey company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is P.O. Box 89490, Cleveland, OH 44101. Service of process for this Defendant may be had upon any officer or director, P.O. Box 89490, Cleveland, OH 44101.

---

[1]      Where the term "Defendants" is used within this Complaint, "Defendants" is intended to and does mean each and every Defendant named in the caption above.

5.      Defendant Progressive Garden State Insurance Company is, upon information and belief, a New Jersey company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is P.O. Box 89490, Cleveland, OH 44101. Service of process for this Defendant may be had upon any officer or director, P.O. Box 89490, Cleveland, OH 44101.

6.      Defendant Allstate New Jersey Property and Casualty Insurance Company is an Illinois company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 2775 Sanders Road, Northbrook, IL 60062.  This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

7.      Defendant Allstate New Jersey Property and Casualty Insurance Company is an Illinois company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 2775 Sanders Road, Northbrook, IL 60062.  This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

8.      Defendant Nationwide Mutual Insurance Company is an Ohio company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is One West Nationwide Boulevard, Columbus, OH 43215.    This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

9.      Defendant Government Employees Insurance Company is a Maryland company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 5260 Western Avenue, Chevy Chase, MD 20815.   This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

10.     Defendant GEICO Casualty Company is a Maryland company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 5260 Western Avenue, Chevy Chase, MD 20815. This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

11.     Defendant GEICO Indemnity Company is a Maryland company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 5260 Western Avenue, Chevy Chase, MD 20815. This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

12.     Defendant USAA Casualty Insurance Company is a Texas insurance company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 9800 Fredericksburg Road, San Antonio, TX 78288. This Defendant may be served with process

through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

13.    Defendant United Services Auto Association is a Texas association registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is  9800 Fredericksburg Road, San Antonio, TX 78288. This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

14.    USAA General Indemnity Company is a Texas insurance company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is  9800 Fredericksburg Road, San Antonio, TX 78288. This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

15.    Defendant Liberty Mutual Fire Insurance Company is a Wisconsin company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 2000 Westwood Drive, Wausau, WI 54401.  This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

16.    Defendant Liberty Mutual Mid-Atlantic Insurance Company

17.    Defendant Liberty Insurance Corporation is an Illinois corporation registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey

and is doing business within the State of New Jersey and whose headquarters is 175 Berkeley Street, Boston, MA 02116.  This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

18.     LM Insurance Corporation is an Illinois corporation registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 2815 Forbs Avenue, Hoffman Estates, IL 60192.   This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

19.     21st Century Centennial Insurance Company 21st Century Centennial Insurance Company is a Pennsylvania company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters  3 Beaver Valley Road, Wilmington, DE 19803. This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

20.     Defendant 21st Assurance Company is a Delaware company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 3 Beaver Valley Road, Wilmington, DE 19803.  This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

21.     Defendant 21st Century Pinnacle Insurance Company is a New Jersey company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 21 Century Plaza, 3 Beaver Valley Road, Wilmington, DE 19803.   Service of process for this Defendant may be had upon any officer or director, 21 Century Plaza, 3 Beaver Valley Road, Wilmington, DE 19803.

22.     Defendant Hanover Insurance Company is a New Hampshire company  registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 100 North Parkway, Worcester, MA 01605.  This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

23.     Defendant American Family Home Insurance Company is a Florida company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 1301 River Place Boulevard, Ste. 1300, Jacksonville, FL 32207.  This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

24.     Defendant Hartford Insurance Company of the Midwest is an Indiana company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is 501 Pennsylvania Parkway, Ste.400, Indianapolis, IN 46380.  This Defendant may be served with

process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

25.     Defendant Hartford Underwriters Insurance is a Connecticut company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is One Hartford Plaza, Hartford, Connecticut 06155.   This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

26.     Defendant Hartford Fire Insurance Company is a Connecticut company registered with the New Jersey Department of Banking and Insurance to do business in the State of New Jersey and is doing business within the State of New Jersey and whose headquarters is One Hartford Plaza, Hartford, Connecticut 06155.   This Defendant may be served with process through the New Jersey Commissioner of Banking and Insurance, New Jersey Department of Banking and Insurance, 20 W. State Street, Trenton, NJ 08625.

## JURISDICTION AND VENUE

27.     Original jurisdiction and venues exists in this Court pursuant to 28 U.S.C. § 1331, as the Plaintiff assert causes of action arising under the United States Constitution, and/or laws and treaties of the United States; and 28 U.S.C. § 1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim(s) occurred.

## FACTS

28.     The Plaintiff is in the business of recovery and/or repair of motor vehicles involved in collisions within the State of New Jersey.

29.     Each individual Defendant is an insurer providing automobile policies to consumers throughout the state of New Jersey.

30.     The Plaintiff has done business at various times over the course of years with the Defendants' policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair service. Each Defendant is individually responsible for payment for those repairs for their respective policyholders and claimants.

31.     Over the course of several years, the Defendants have engaged in an ongoing, concerted and intentional course of action and conduct with State Farm acting as the spearhead to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiff and the substantial profit of the Defendants.

32.     One of the methods by which the Defendants exert control over body shops is by way of entering program agreements with body shops. Although each Defendant's program agreements have unique titles, such agreements are known generally and generically within the collision repair industry as direct repair program agreements ("DRPs").

33.     DRPs were presented to body shops as a mutually beneficial opportunity. In exchange for providing certain concessions of price, priority and similar matters, the individual Defendants would list a body shop as a preferred provider.

34.     However, the concessions demanded by the individual Defendants in exchange for remaining on the direct repair program were not balanced by the purported benefits. The Defendants, particularly State Farm, have utilized these agreements to exert control over the Plaintiff's business in a variety of manners, well beyond that of an ordinary business agreement an even though Plaintiff is not a DRP shop for any Defendant insurer.

35.     Defendants, particularly State Farm, have engaged in an ongoing pattern and practice of coercion and implied threats to the pecuniary health of the Plaintiff's business in order to force compliance with unreasonable and onerous concessions. Failure to comply results in either removal from the program (s) combined with improper "steering" of customers away from the Plaintiff's business, or simply punishment to decrease the number of customers utilizing the Plaintiff's services, via improper steering.

36.     According to the Company Market Share Report, the Defendants collectively control over 72% of the private passenger auto insurance market within the State of New Jersey.

37.     The vast majority of the Plaintiff's' business is generated by customers for whom the Defendants are responsible to pay repair costs.  The insurance-paying customers account for between seventy and ninety-five percent of each shop's revenue.   Overall, courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs.  *See, e.g., Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006)(aff'd, *Allstate Ins. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

38.     As a general proposition, each DRP contains a general statement that the body shop will charge the respective insurance company no more for any particular repair than is the going rate in the market area.

39.     In order to establish the "market rate," State Farm utilizes what it terms "surveys." The geographical boundaries of the market area to be "surveyed" to establish the "market rate" are wholly within the control and direction of State Farm.

40.     Under the terms of its DRP, State Farm is not required to disclose any of the methods by which it establishes either the market area, the market rate, nor any other factual bases for its determination of the "market rate." The agreement contains no provisions for independent and neutral verification of the data utilized, nor any oversight not directly within the control and direction of State Farm.   The shops are simply required to blindly accept State Farm's pronouncements regarding these matters, including those which are not DRP shops, including the Plaintiff.

41.     Previously this "survey" was conducted by sending written documents to the individual shops.  The owner or designated representative of the shop would fill out the survey and return it to State Farm. In recent years, this process has been transferred to an electronic forum, State Farm's Business to Business portal, whereby the shops go online to complete the "survey."

42.     State Farm does not perform a survey in the traditional sense, where information is obtained and results produced, establishing a baseline of all the shops' information.  With respect to labor rates, as an example, State Farm's methodology does not represent what the majority of shops in a given area charge, quite the contrary.  State Farm's methodology lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and descending to the least expensive hourly rates at the bottom.

43.     State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser.  Those are then totaled and State Farm employs it's "half plus one" method.   If, for example, a State-Farm-determined market area has a total of fifty (50) technicians or work bays, State Farm's "half plus one" math equals twenty six (26).  With that number, starting at the bottom of the shop list, State Farm counts each shops' technicians or work

bays until the "half plus one" number is reached, twenty six in this example, and whatever that shop's rate happens to be is declared the market rate.

44.     There could, arguably, be some validity to this method, if it accounted for the variance in shop size, skill of technicians and other quality variables, which it does not.  However, the greatest problem with this method is that State Farm can and does alter the labor rates input by the shops, decreasing those arbitrarily deemed too high–or higher than State Farm wishes to pay.

45.     By altering the rates entered, particularly those of the larger shops, those with the most technicians and/or work bays, State Farm manipulates the results to achieve a wholly artificial "market rate."   The results are therefore not that of an actual survey reflecting the designated market area but created from whole cloth by State Farm.

46.     Furthermore, State Farm attempts to prohibit shops from discussing with each other the information each has entered into the survey, or their respective rates in general–whether or not participating in State Farm's program– asserting any discussion may constitute illegal price fixing.  State Farm selects the geographical boundaries of the "survey," and State Farm retains the right to alter the "survey" results and does so.  All without disclosure or oversight.

47.     Another electronic page on State Farm's business portal is known as the Dashboard/Scorecard. An example of State Farm's Dashboard is attached hereto for descriptive purposes as Exhibit "2."

48.     The Dashboard has substantive impact on several levels.  It serves as the record of an individual shop's survey responses.   It also provides a "report card" and rating of the individual shop based primarily upon three criteria: quality, efficiency and competitiveness.

49.     Within the quality criterion, the shop's reported customer satisfaction, customer complaints, and quality issues identified by an audit are scored.

50.     The efficiency criterion evaluates repair cycle time, number of days a vehicle is in the shop, utilizing information input by the shops on the car's drop-off and pickup dates.

51.     The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized, the number of hours required to complete repair and similar matters.  An example of a State Farm score card is included within Exhibit "2," second page.

54.     In rating an individual shop, a total score of 1000 is possible. However, State Farm is under no obligation to disclose the weight or total number of points possible given to each factor included in reaching the score, particularly those factors included under the competitiveness criterion.  In fact, State Farm has refused to disclose its method of determining competitiveness even to its own team leaders.

55.     Due to this opacity, State Farm maintains complete and unsupervised authority to determine an individual shop's rating. It is therefore possible for a shop to have no customer complaints, high customer satisfaction, no issues identified on an audit, complete compliance with all repair cycle time and efficiency requirements and yet still have a low rating.  It is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous issues identified on audit and complete failure to meet efficiency expectations and yet have a very high rating.

57.     The Dashboard rating is very important as a shop's rating determines its position on the list of preferred providers.  When a customer logs on to the State Farm web site seeking a repair shop, those shops with the highest ratings are displayed first.  A shop with a low rating will be at the bottom of the list, often pages and pages down, making it difficult for a potential

customer to find it.  If a customer calls State Farm, the representative provides the preferred shops

beginning with those holding the highest rating.

### Suppression of Labor Rates

57.     Among the questions asked by the "survey" is the individual shop's hourly labor

rate. This information is supposed to be provided by the shop and to accurately reflect that shop's

labor rate to allow State Farm to reach a "market rate."  The actual method of determining a

"market rate" is described above.

58.     If the labor rate information received is unilaterally deemed unacceptable by State

Farm, a State Farm representative will contact the shop and demand the labor rate be lowered to

an amount State Farm wishes to pay.

59.     If the body shop advises its labor rates are higher or will be increasing, State Farm

representatives will inform the body shop they are the only shop in the area who has raised its

rates, therefore the higher rate does not conform with the "market rate" and is thus a violation of

the direct repair program agreement.  Even when a shop, such as Plaintiff, is not a DRP shop, this

DRP term is enforced against it.

60.     At various points in time, State Farm has utilized this method of depressing labor

rates, telling each shop they are the only one to demand a higher labor rate when, in fact, multiple

shops have attempted to raise their labor rates and advised State Farm of such.

61.     Should a shop persist in its efforts to raise its labor rate, State Farm will take one

or more of several "corrective" measures: it will go into the individual shop's survey responses

and alter the labor rate listed without the knowledge or consent of the shop and use this lowered

rate to justify its determination of the "market rate." It will threaten to remove the shop from the

direct repair program to coerce compliance.   It will remove the shop from the direct repair program.

62.     The net effect of this tactic is to allow State Farm to manipulate the "market rate" and artificially suppress the labor rate for the relevant geographic area, an area which, again, is defined solely by State Farm and is not subject to either neutral verification or even disclosure.

63.     The remaining Defendants, intentionally and by agreement and/or conscious parallel behavior, specifically advised the Plaintiff they will pay no more than State Farm pays for labor.  These Defendants have not conducted any surveys of their own in which the Plaintiff has participated to determine market rates.  These Defendants have agreed to join forces with State Farm, the dominant market holder, and each other to coerce the Plaintiff into accepting the artificially created less-than-market labor rates through intimidation and threats to the Plaintiff's financial ability to remain operating.

## Suppression of Repair and Material Costs

64.     Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing the Plaintiff into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

65.      Some of these methods include but are not limited to: refusal to compensate the shops for replacement parts when repair is possible though strongly not recommended based upon the shop's professional opinion; utilizing used and/or recycled parts rather than new parts, even when new parts are available and a new part would be the best and highest quality repair to the vehicle; requiring discounts and/or concessions be provided, even when doing so requires the shop to operate at a loss; de facto compulsory utilization of parts procurement programs.

66.     In addition to the above, the Defendants have repeatedly and intentionally failed to abide by industry standards for auto repairs. Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry:

a)     ADP;
b)     CCC; and
c)     Mitchell.

67.     These databases provide software and average costs associated with particularized types of repairs to create estimates.  The estimates generated by these databases include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition.  These databases and the estimates they generate are accepted within the industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario"[2] presented by the procedure databases and the actual needs of a particular repair.

68.     Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, but have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and materials. In many instances the Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring body shops to perform less-than-quality work or suffer a financial loss on a given repair.

69.     A non-exhaustive list of procedures and processes the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit "3."

---

[2]     The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment which are specifically designed to fit that particular vehicle. Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, particularly with repairs for which State Farm and the other Defendants are responsible for payment, which can substantially affect repair procedures required, repair times and necessary materials.

70.     At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendant will cite the database estimate and pay for only fifteen hours of labor time.

71.     With respect to materials, while it is inarguable that materials must be expended to repair automobile collisions, the Defendants simply refuse to pay for them, asserting materials are part of the cost of doing business.  This is the Defendants' position even when the authoritative databases specifically state that such materials are <u>not</u> included in the repair procedure pages.

72.     The only partial exception to this practice is paint.  While paint costs are factored into the amount the Defendants will pay, it is calculated via a formula which compensates the shops for only half the actual cost on average.  The Defendants' method of calculating paint payment does not take into account the type of paint needed/used, the requirement that paint be mixed to match the existing color of the vehicle, the actual amount of paint required to complete the job, the type of vehicle involved or any other factor.  Defendants pay only based upon arbitrary caps, self-established and unrelated to actual costs.

73.     This continued refusal and/or failure to compensate Plaintiff for ordinary and customary repairs and materials costs places Plaintiff in the untenable position of either performing incomplete and/or substandard repairs and thus breaching its obligation to automobile owners to return vehicles to pre-accident condition, or performing labor and expending materials without proper compensation and thereby jeopardizing continuing viability of the business enterprise.

74.     As illustration:  The foregoing concerns prompted a meeting between many body shops involved in an action originally filed in the United States District Court, Southern District of Mississippi, styled as *Capitol Body Shop, Inc. et al v. State Farm Mut. Auto Ins. Co.,* Cause No. 3:14-cv-12.[3] There, body shops, Tim Bartlett, State Farm Estimatix team leader, John Findley, Estimatix section manager, Steve Simkins, State Farm counsel for Mississippi and Alabama, and members of the Mississippi Department of Insurance met in April, 2013. At this meeting, the members of the automobile collision repair industry expressed their dissatisfaction and concerns with the very practice of refusing to compensate fully and fairly for repairs that were performed and State Farm's inconsistent application of the database estimating software, i.e., utilizing database estimates only when it is in State Farm's financial best interest to do so.

75.     State Farm representative Tim Bartlett acknowledged (before witnesses) that repairs and subsequent payment for those repairs should be consistent with the estimates prepared through the database software. Mr. Bartlett assured those present, and the Department of Insurance representative that it would begin abiding by those database estimates and stated it would raise the matter at its insurance industry meetings, held locally approximately once a month.

76.     Also at that meeting, Mr. Simpkins asked if insurance representatives might be permitted to attend the meetings of the Mississippi Automobile Collision Society. The association representative present for the meeting, John Mosley, invited State Farm to attend those Association meetings if State Farm would permit members of the Association to attend the insurance meetings. Mr. Simkins refused.

---

[3]     http://www.njd.uscourts.gov/sites/njd/files/forms/DisclosureStatementRevised.pdf.

77.     Despite the assurances given the body shop representatives and the Department of Insurance at this meeting, State Farm failed to perform as promised in Mississippi. The same status has continued in New Jersey.  State Farm, and the other Defendants in collusion with State Farm, have continued to refuse to make payment and/or full payment for necessary and proper repairs, labor and materials.

78.     Defendant State Farm also imposes restrictions upon the Plaintiff's ability to obtain and utilize quality replacement parts and materials.  As part of its DRP agreement, State Farm asserts it has the unilateral authority to enter into separate agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

79.     Despite the fact that shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached, even if they do not make purchases with those vendors.  Although presented as an option to participate, the optional language is rendered nugatory by additional language which requires shops to accept as payment only that amount for which the parts and/or materials could have been obtained through those agreements.  Participation or lack thereof is therefore completely meaningless and the optional language is illusory.  The Defendants enforce these limitations and/or requirements across the board, even against shops, like the Plaintiff, which are not DRP shops.

80.     Moreover, shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement.  Thus, the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts end in a shop operating at or near a loss for each repair.  Again, this is a requirement enforced against all shops, even non-DRP shops like the Plaintiff.

19

81.     Additionally, the GEICO defendants have recently begun to delay payment on supplements and delay reinspecting vehicles.  When the GEICO Defendant insurer representative does arrive, the representative tells the customer the bill is "too old" and refuses to pay it.  This requires either the Plaintiff to absorb the unpaid repair cost or the customer to pay it.

82.     Though led by State Farm, all Defendants have agreed to and/or consciously parallel the compensation ceilings established by State Farm solely for their own profit.

**Steering**

83.     The Defendants regularly and routinely engage in "steering" in order to punish noncompliant shops. New Jersey law prohibits automobile insurance companies from requiring consumers to use particular body shops to effect repairs. In order to avoid facially violating this law, the Defendants will "steer" insureds and/or claimants to favored, compliant shops through misrepresentation, insinuation, and casting aspersions upon the business integrity and quality of disfavored repair centers.

84.     Examples of this practice include telling insureds and/or claimants that a particular chosen shop is not on the preferred provider list, that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer, that repairs at the disfavored shop will take much longer than at other, preferred shops and the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

85.     These statements have been made about the Plaintiff without any attempt to ascertain the truth thereof. Not only that, some of the ills recited which implicitly criticize the

20

Plaintiff are wholly attributable to the insurer itself.  For instance, the statement that repairs will take longer at a disfavored shop–consumers are not told the delay in beginning repairs is due to the insurer's decision to delay sending an appraiser to evaluate the damage, a decision completely and wholly within the control of the Defendants.  Asserting the shops charges more is often not a function of what the shop actually charges but the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant.  Yet both are conveyed to the public as problems with the shop rather than the effect of Defendants' own decisions.

86.     The most egregious of these statements, that the Defendants cannot guarantee the work of the shop, is particularly misleading as none of the Defendants offer a guarantee for repair work. Instead, the Defendants require the body shops to provide a limited lifetime guarantee on work performed.  In the event additional work is required, the body shop is required to do so without any additional payment, or to indemnify the insurer for costs if work is performed at another shop.

87.     Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clearly understood inference is that it can and will guarantee the work of another, favored shop, which is simply not true.

### Intentional Nature of Defendants' Conduct

88.     In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the Southern District of New York.  The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act, also known as the Sherman Antitrust Act.  A copy of this Decree is attached hereto as Exhibit "4."

89.    Specific actions supporting those allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused.  The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

90.    The Consent Decree order provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

91.    Whether or not any current Defendant is legally bound by this Decree, the actions described in the present cause fall squarely within those prohibited by the Decree.  The Decree has been "on the books" for fifty years and is well-known within the insurance industry.

92.    Being known, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiff.

## CLAIMS FOR RELIEF

## <u>COUNT ONE:  QUANTUM MERUIT</u>

93.     Quantum meruit rests upon the equitable principle that a party is not allowed to enrich itself at the expense of another. More specifically, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefore.

94.     Plaintiff has performed valuable services and expended material resources with the reasonable expectation of payment\compensation for those services and materials. This is their business. Performing said services and expending material resources benefitted Defendants and Defendant's insured/claimants for whom Defendants are required to provide payment for repairs.

95.     It was and has always been foreseeable the Plaintiff was not performing labor or providing services and materials without expectation of full payment. However, Defendants have simply taken the position that payment may not be made unless they choose to provide it, regardless of any other factor or consideration and have thus enriched themselves at the expense of Plaintiff.

96.     Plaintiff is equitably entitled to receive payment for the materials and services rendered.

## <u>COUNT TWO:   UNJUST ENRICHMENT</u>

97.     A quasi-contract, or constructive contract, is based on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. A defendant is obligated to pay for services rendered for it by plaintiff, if the circumstances are such that plaintiff reasonably expected defendant to compensate it, and if a reasonable person in defendant's position

would know that plaintiff was performing the services in confidence that the defendant would pay for them..

98.    It is an obligation created by law, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money under circumstances that in equity and good conscience ought not be retained and which in justice and fairness belongs to another.

99.    In the present case, Defendants' insureds and claimants entrusted the Plaintiff with the full and complete repair of their vehicles, the cost of which it is incumbent upon the Defendants to pay. It was and has always been foreseeable the Plaintiff was not performing labor or providing services and materials without expectation of full payment. An obligation was thus created to provide payment to for their work and expended materials for which the Defendants have not paid.

100.    By failing to make payment and\or full payment for the necessary and reasonable costs of repair, Defendants have obtained or retained money which, in equity and good conscience, rightfully belongs to the Plaintiff.

## COUNT THREE:   QUASI-ESTOPPEL

101.    Quasi-estoppel is an equitable principle. This long-standing doctrine is applied to preclude contradictory positions by preventing a person from asserting to another's disadvantage a right inconsistent with the position previously taken.  Quasi-estoppel describes a situation in which an individual is not permitted to 'blow both hot and cold,' taking a position inconsistent with prior conduct, if this would injure another, regardless of whether that person has actually relied thereon.

102.    The Defendants have relied upon and asserted the validity\authority of the databases, supra, when it has been to their respective advantage. Despite this, State Farm and the other Defendants have refused to compensate and\or fully compensate Plaintiff for materials expended and work performed, including labor and labor rates, upon reliance of these very same guides, claiming they are unnecessary to complete the work at hand.

103.    Defendants' inconsistent and contradictory application of, or refusal to abide by, the guidelines of the industry databases has created an atmosphere of doubt, uncertainty and distrust, all to the severe detriment of Plaintiff while, at the same time, seeking to obtain every improper advantage for Defendants themselves.

104.    Plaintiff therefore seeks to have the Defendants estopped from denying the applicability and reasonableness of the baseline procedures and costs set forth in the industry databases henceforth and make full payment for the necessary reasonable costs of repairs made for the benefit of Defendants' insureds and claimants.

## COUNT FOUR: DEFENDANTS HAVE VIOLATED

## NEW JERSEY CODE § 56:9-3

105.     Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful.  N.J. Stat. § 56:9-3.106.     For violations of this statute, a party injured by the proscribed actions of a defendant is entitled to treble damages.  N.J. Stat. § 56:9-12.

107.    Defendants herein have repeatedly and intentionally violated this statute.  The Defendants have formed and engaged in a conspiracy or combination to impose maximum price limits upon the Plaintiff for its products and services.  The aforesaid offenses have had the effect of eliminating competition within the automobile damage repair industry, elimination of some

shops from substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

108.    Plaintiffs have been damaged by Defendants' violation of this statute.

## COUNT FIVE: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

109.    Tortious interference with prospective economic advantage occurs when a Defendant intentionally, wrongfully interferes with the reasonably anticipated prospective economic advantage of which the defendant was aware at the time and said interference causes Plaintiff to incur damages.

110.    The Defendants have repeatedly engaged in malicious actions and a course of conduct designed to interfere with and injure the Plaintiff's business relations and prospective business relations. The Defendants have repeatedly steered and attempted to steer customers away from the Plaintiff's business through their repeated campaign of misrepresentation of facts, failure to verify facts damaging or tending to cause damage to the Plaintiff's business reputation before conveying the same to members of the public, implications of poor quality work, poor quality efficiency, poor business ethics and practices, and unreliability.

111.    The purpose of these actions was twofold: to punish the Plaintiff who complained about or refused to submit to the various oppressive and unilateral price ceilings the Defendants were enforcing upon it, and to direct potential customers of the Plaintiff to other vendors who would comply with the maximum price ceilings unilaterally imposed by the Defendants.

112. The Plaintiff has been damaged by the Defendants' malicious and intentional actions. Plaintiff is therefore entitled to compensation for these damages.

## COUNT SIX: VIOLATION OF THE SHERMAN ACT–PRICE-FIXING

113.    The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade. 15 U.S.C.  § 1.   Such agreements are illegal if open (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

114.    On information and belief, through explicit agreement, the Defendants have formed and engaged in a conspiracy or combination to impose maximum price limits upon the Plaintiff for its products and services . An agreement among buyers to fix the maximum price they will pay to sellers is no less a violation of the Sherman Act that an agreement among sellers to fix the price they will charge to buyers .

115.    The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co. vs. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

116.    The Defendants and co-conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

117.    The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops.

118.    Evidence of this conspiracy or combination includes, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves; statements by defendants that they will conform to State Farm's payment structure ; Defendants' admitting the baseline application of the industry

27

database but failing to conform to that minimum standard; and the uniformity of action by all Defendants.

119.    A horizontal agreement among competitors to use the same method of determining or providing payment such a State Farm's method for determining the "market rate" is no less unlawful and agreed to specific dollar amounts. *FTC v. Cement Institute*, 333 U.S. 683 (1948).

120.    Absent agreement, Defendants' conspiracy would not work , because its success depends on multiple steps, from setting "market rate" for labor to moving repair shops down the list of recommended repairs facilities to steering customers away from non-compliant shops. Moreover, any economic incentive insurers may have to reduce expenditures on collision repairs is more than overcome by the incentive insurers have to gain market share by advertising themselves as the insurer that does not cut corners on safety and quality of repair work, but instead make sure that repairs done properly.

121.    Defendants' conduct runs counter to the millions of dollars insurers spend to gain or maintain market share by advertising "new car replacement" and "accident forgiveness" policy terms. Furthermore, Defendants' actions are not entitled to any presumption they are the product of unilateral activity, as opposed to concerted action, under *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984) and *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), because their conduct is not pro-competitive and merits no special protection.  To the contrary, Defendants' conspiracy creates the risk of improper repairs and putting unsafe vehicles back on the road.  For instance, under the Ninth Circuit's decision in *In re Petroleum Products Antitrust Litigation*, 906 F.2d 432 (9th Cir. 1990), such actions enjoyed no *Monsanto* or *Matsushita* protection, and Defendants' lockstep behavior alone, or in combination with the plus

28

factors noted above, is enough to give rise to an inference of conspiracy. See also *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996 (3rd Cir. 1994).

122.    The aforesaid offenses have had the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

123.    Defendants' actions collectively have violated federal law and directly caused the plaintiff to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

### COUNT SEVEN: VIOLATION OF THE SHERMAN ACT–BOYCOTT

124.    The United States Supreme Court has repeatedly held that boycotts constitute a violation of the Sherman Act, 15 U. S. C. §1. "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

125.    The Defendants have engaged, and continue to engage, in boycott and boycotting activity through their repeated actions of steering customers away from the Plaintiff through allegations and intimations of poor quality work, of poor efficiency in performing work, of questionable business practices, of overcharging, impugning integrity, and similar actions so as to withhold and\or enlist others to withhold patronage from the Plaintiff.

126.    This boycott was specifically designed to pressure, intimidate, and/ or coerce the Plaintiff into complying with the maximum-price limitations unilaterally conceived by Defendant State Farm and agreed to collusively by the other Defendants.

127.    It is irrelevant for purposes of the Sherman antitrust boycott activity that the Plaintiff and Defendants are not direct competitors within the same industry. The United States Supreme Court has directly addressed this issue in *St. Paul Fire and Marine Insurance Company*, supra, stating, "[B]oycotters and the ultimate target need not be in a competitive relationship with each other."  438 U.S. at 543.

128.    The enlistment of third parties as a means of compelling capitulation by the boycotted group has long been viewed as conduct supporting a finding of unlawful boycott. *Id*.

129.    In the present matter, the Defendants have engaged in not only a boycott, but have regularly, routinely and purposefully enlisted the aid of unwitting third parties in carrying out their boycott through their intentional acts of steering those customers away from the Plaintiff.

130.    Defendants' boycott was created and carried out with the sole purpose and intent of financially coercing and threatening the Plaintiff into complying with the Defendants price caps.

 The Defendants actions are violation of federal law and have directly caused the Plaintiff to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief requested herein is granted.

## <u>PRAYER FOR RELIEF</u>

As a result of the Defendants' actions, Plaintiff has been substantially harmed and will continue to suffer unless the relief requested herein is granted.  The Plaintiff therefore prays for the following relief:

A.    Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.    Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.    Damages sufficient to compensate Plaintiff for lost business opportunities as determined by a jury.

D.    Treble damages, reasonable attorneys' fees and costs  for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.    Injunctive relief prohibiting the Defendants from further engaging in any of the following:

    (1)    Placing into effect any plan, program or practice which has the purpose or effect of:

        (a)    directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

        (b)    fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

    (2)    Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiff to participate in any parts procurement program.

    (3)    Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

    (4)    Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.    Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G.      Pre- and post-judgment interest.

H.      Any additional relief the Court deems just and appropriate.

## **CONCLUSION**

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendants in an amount sufficient to fully compensate Plaintiff for damages incurred as a result of Defendants' conduct with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive damages, attorneys' fees, expenses, costs and any other relief to which the Court deems the Plaintiff entitled.

Dated:  Clifton, New Jersey                 ANSELL GRIMM & AARON, P.C.
            November 7, 2013

                                      By:   _____
                                            Joshua S. Bauchner, Esq.
                                            341 Broad Street
                                            Clifton, New Jersey  07013
                                            (973) 247-9000
                                            (973) 247-9199 facsimile
                                            jb@ansellgrimm.com

                                            -and-

                                            Allison Fry, Esq.
                                            EAVES LAW FIRM
                                            101 North State Street
                                            Jackson, Mississippi  39201
                                            (601) 355-7961
                                            allison@eaveslaw.com